The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning, everybody. Please be seated. Welcome to the 4th Circuit. We have three cases on our calendar this morning. The first is 22-2L and 22-3, Stanko v. Stirling. Mr. Perkovich, whenever you're ready, sir. Thank you, Your Honor. May it please the Court. This morning we aim to focus on, one, the District Court's violation of the unanimous opinion in Ayeses v. Davis due to the effective denial of Mr. Stanko's use of essential, entitled, and authorized expert services under 3599F. This best provides consideration of the Court's latter two COA issues concerning the ineffectiveness of the conflicted defense counsel, Diggs. Second, we intend to address the first couple of COA issues concerning the conflict from the vantage of AEDPA, and to that extent, I'll address the lack of a knowing and intelligent waiver of Diggs' divided loyalties against Mr. Stanko. Mr. Stanko repeatedly established the entitlement under 3599F to expert funding in the District Court, first in a submission in January of 2020, which was... to raise it now? That's established by Ayeses and other authorities. As a matter of right, this is not a determination of a claim. It is the entitlement of 3599, and so that's black-letter law under Ayeses and other authorities. I know the cases you're talking about, but I'm just trying to figure out how this is not an appeal of a final order. This is not coming up on interlocutory review, right? It's coming up on appeal of a final order, and your claim is that there was a procedural irregularity in the proceeding below, and we held in Reed that the denial of a 60B motion does... an appeal from a denial of a 60B motion does require a certificate of appealability, because you're calling into question the merits of whether the proceeding the first time was regular or not, and this seems to fit pretty cleanly under Reed. We're not seeking to reopen any judgment through 60B. We're simply pointing out that that order was not carried forward, and it was summarily, along with the summary judgment grant, disposed of. So there was no separate ruling on the 3599E or F determinations to discrete orders prior to the summary judgment grant, which had come just three weeks after the use of those funds in the first instance for brain imaging, which the court also ordered. So I would certainly distinguish this from a Rule 60B posture, and again, there was no separate order essentially trying to vitiate the prior orders of the district court, which the chief judge's predecessor had also issued concurring orders on. And with respect to those orders, they're vital in this case, because what they promised was the first mental health and brain-related evaluations in the history of this case, because of the anomalous order of the post-conviction court with regard to funding experts. And I say anomalous because in the annals of South Carolina practice since EDPA and the PCR Act in that state, so we're going back three decades, this is a singular determination of that funding statute, which also uses the reasonably necessary standard. And also, this is the first instance or prospect for mental health evaluations in this case because of the bizarre strategy of the conflicted attorney in the two trials, which entailed using a psychopathy theory and very truncated siloed uses of experts rather than instructing them to conduct mental health evaluations under the standard of care for capital counsel. So the disruption to that effort that the summary judgment grant contemplated or delivered is extremely paralyzing here. Assuming for the sake of argument you don't need a COA for this, which I'm inclined to think you did, but assuming for the sake of this discussion that you don't, what is wrong with what I understand to be the district court's basic take that after Shin, let's just assume this shows the most helpful thing in the world to you, it doesn't matter. So all of this is sort of, I mean, you're like, there's sort of the district court, like we did something and then we undid it, but it's not like nothing happened. What happened is Shin versus Ramirez happened. And what's wrong with the intuition to like, I don't know how any of this is going to matter in light of Shin. Your Honor, first, Shin was not decided until two months after the summary judgment grant. I want to underscore that. So that has happened since that grant. Since then. The point is well taken, but that was not the response. So that's not how we make sense of the order from Judge Gergel, right? It was capricious in the posture in terms of. Okay, then why in light of Shin isn't it completely harmless? On this particular record, I pointed to the anomalous ruling in the PCR court, right, where the determination was, and I'll read it to you, cannot be deemed reasonably necessary to the applicant's representation until after the services are performed and a beneficial result obtained, right? So a retrospective determination of whether funding is worthy is what the PCR court decided. And again, this is a unique ruling in capital cases in that state. And so as a function of that, PCR counsel struggled mightily in the PCR court, filed six funding motions. They litigated this for a year to no avail. They ultimately were shut out of any expert funding with respect and including a mental illness evaluation, a neuropsychologist, forensic psychologist. And so they did not fail to develop this evidence, right? So this is not a function of Shin where state postconviction counsel was deficiently performing and the record wasn't developed. Here, we've got PCR counsel performing at the standard and going beyond that standard, and it's the PCR court that's depriving the process. This court has recognized that E2, as interpreted by Williams, and also Townsend v. Sane calls for an evidentiary hearing in instances like this where the process has been shut down through no fault of the litigant. And this record is very stark in that respect. It seemed like what you were arguing before the district court was that it was error to grant summary judgment without waiting for these results because they would call into question the validity of the waiver. But now you're making a different argument for why these results are necessary? Well, we want to focus on the E2 argument here. Well, I know, but I guess I'm trying to figure out what was in front of the district court. Did you make this argument in front of the district court? It seems like before the district court, you were making a different argument. For the district court, we were arguing both that because of Martinez, we would be able to present this evidence, but beyond that, there's not a failure to develop fundamentally on this particular record. And so the question then after whether evidentiary development can occur in the district court, and clearly it can on this particular PCR record, the state has insisted that, and the district court agreed that the ineffectiveness issues have been procedurally defaulted. That is mistaken, too. And that is because in the petition to the state supreme court, PCR council extensively addressed these ineffectiveness issues. So are we talking about issue sort of COA issue 3 or COA issue 4? What issues are we talking about right now? 3 and 4, the ineffectiveness issues in relation to the performance as it concerns penalty, but also to some extent liability. And you say these were extensively developed in the cert petition? To the state supreme court, yes. Extensively developed? I mean, I can see an argument that you put them in footnotes and that's enough, but you're saying somewhere else it was extensively developed? It is the whole sweep of the petition. In other words, the petition is very centered on the funding denial. The funding is to serve the purpose of providing those claims and specifically prejudice to those claims. And at JA 6763 through 64, the claims are articulated and delineated in concluding the argument. I should also say that, you know, Wiggins was cited no fewer than nine times throughout the opinion. Strickland a half dozen times. Williams versus Taylor. Terry Williams four times. So there's no question that the ineffectiveness of counsel is squarely in that petition. Further, the state's return. Can I just ask you a question? So the South Carolina rules say that if you want to raise something uncertain, you have to put it in your questions presented. And since this is not in the questions presented, I just have a slight concern that, given its own rules, the South Carolina court would not have really been on notice that it was supposed to look into the footnotes and the general vibe of the petition, that it was entitled to just proceed based on the questions presented. I'll also point out that the state's return squarely speaks to, at length, these ineffectiveness claims that, again, were precluded, in effect, from presentation as a matter of a cert petition. So I understand the court's rules, but, you know, at the hearing, the post-conviction hearing, counsel waived seven claims for the hearing because they lacked evidence to put on with respect to the prejudice prong of the Strickland analysis. I'm sorry, can you just repeat what you just said? At the March 2015 hearing, literally at the hearing, PCR counsel waived the ineffectiveness claims in terms of the presentation of evidence because she had no evidence to put on with respect to prejudice. And on the record, objected to proceeding because of the denial of funding. She was not able to put on her case because she did not have the resources, as every other state capital post-conviction case has had in that jurisdiction, to put forward prejudice. So in that context, all that could be taken up in terms of questions presented, also under the South Carolina rules, were the denial of funding and the conflict issues. But laden throughout the application to that court, of course, is the substance underneath this. I'm sorry, I will stop bothering you, but I'm just having trouble following what you're saying. Both your briefs before us, and now it sounds like also counsel at the hearing, say these issues were not raised before the state Supreme Court. So is your argument that they were not raised, but that doesn't matter because the reason they weren't raised is because the denial of funding, or is your argument that they were raised? They were fairly presented. They were not raised as a matter of the state procedure, but they were fairly presented to the state court under the federal jurisdiction. Not raised, but fairly presented. All right, so let me take another step back. So claims, what I'm calling certified claims three and four. Judge Gergel said those claims were not exhausted, right? That's what he said. He did not consider them because he said they were unexhausted. Is your contention today that Judge Gergel was wrong when he said those claims were unexhausted? He is wrong. Okay, so now let me ask you another question. How do I square that with the statement on page 77 of your blue brief where you say claim three, quote, was never fairly presented to the state court? That sounds like a concession that they aren't exhausted, not an argument that they were exhausted. So let me posit with my scarce time that in the alternative to the fair presentation here, which the record does reflect and your point is taken with respect to the briefing, the defect in the state process is also at issue here. So for what I was explaining previously with this anomalous order and the struggle of state post-conviction counsel to develop this evidence and present it under 2254B1-B2, right, we have a frustration of the process in state court which also requires or permits the disregard of exhaustion concerns in the direct presentation. Mr. Pukovich, can I, before your time runs out, can I take you back to the very beginning of your argument where you led with the contention that the reason why this evidence of the expert evidence with respect to brain scans and the like was so critical to the defense was because it hadn't been adequately developed. But my understanding of the record is that that was the primary focus of the defense at trial, that there was a malformed brain, there were experts who testified with respect to that. So are you saying that it wasn't developed in the way that you would like now to develop it or it wasn't developed entirely because those are two different things? It wasn't competently developed. There were pictures, there was dazzling evidence put forward by a very plainly incompetent presentation. Direction of counsel, which was essentially steered by the psychiatrist who promised that he could establish insanity, led to a marshaling of experts in a very siloed way which is not remotely in the standard of care. So there is not a single mental health evaluation, full stop. There were images, there were pictures put forward to set up the psychiatrist to explain why psychopathy was equivalent to insanity, which was a ludicrous proposition to begin with and it was repeated a second time. I've got 20 seconds left. I've not addressed the conflict. Actually, you don't. You're over time. Oh, apologies. You've got some time left for rebuttal. I'd like to ask you a couple of questions about issue one. So just to clarify what I say with issue one, this is the argument that a conflict of this nature is not waivable. That's the argument. So question one on that, do you think that that question is subject to the EDPA deference standard? As in, is the question whether we think this conflict is unwaivable or do you think the question is whether a determination that it is waivable is contrary to or an unreasonable application of clearly established federal law? What's the standard for us? It would be the former standard. Why? Because of the underlying determination, the inquiry that's going on. You said the former. It's the EDPA standard or it's the straight merit standard? Straight merit standard. Why? Well, I think the best way to approach this is through the waiver question, right, if this is a consentable question. No, no. Whether it's waived is a factual question that depends on the facts and circumstances of your client's situation. The question of whether a conflict of this nature is inherently unwaivable is a question of law. It is, Your Honor, and this is what the state argued pre-trial. Of course, as a matter of state law, as a matter of federal law, it also would be unwaivable. We don't care if it's unwaivable as a matter of state law. We only care if it's unwaivable as a matter of the federal constitution. Fair enough, as I said. As well, with respect to EDPA's application, and clearly established by virtue of Supreme Court jurisprudence, there is not a case on all fours with respect to that. But why do you think this is subject to EDPA deference? It didn't look to me like this was raised in state court, and as a result, it was never addressed by the state court, whether this is inherently unwaivable. Your colleague has not raised this default problem, and I think that means we would review this question de novo. And the district court did. The district court, I don't think, applied EDPA deference to this question. Well, true, and it's also unclear whether there is... Right, I mean, I think that's probably the best way to address the district court's determination because it does not articulate the court what decision it is actually applying 2254-D to. So it mistakenly applies Strickland as opposed to Coyler v. Sullivan. Okay, so then Mike, assuming it's de novo, then let me ask you this question. What is your best authority for the proposition that a conflict of this nature is unwaivable? Because it seems to me that your brief cobbles together a bunch of quotes from cases that sort of say stuff about conflicts, but I don't see any of them actually suggesting to me that a conflict of this nature is inherently unwaivable. I understand there's an argument that maybe it wasn't validly waived here, but the argument that you literally could not validly waive this conflict. What is your best case for that proposition? Well, our best case would have to be Christensen, which interprets Holloway and recognizes that there the conflicted counsel rightly, according to the court in Christensen, recognized that that conflict was unwaivable because they had to argue against their own interest. And in parallel here, we have a conflicted counsel who's needing to litigate against his own interest in relation to the second trial. He needs to double down on the second trial in order to keep the appointment, which he desperately needs, and the record reflects he's running a deficit in his own operating account at the time and siphoning funds, trust funds, from minor clients, child clients, to the tune of $100,000 while the second trial's happening for Mr. Stanko. And so his reputational interest, his interest in not denigrating his performance, is very concrete. And we have successive cases, conflict here, but a very unusual, if not unique, record in that the two clients are the same client. In other words, Mr. Diggs had a duty to the Georgetown process. And by process, I mean an enduring duty to his client to work with post-conviction counsel in the Georgetown proceeding. And I point to, and this is not in our brief, but the ABA guidelines are clear, both in 1989 and 2003, and I point to guideline 10.13 with respect to the duty, the necessity to cooperate with professionally appropriate legal strategies as may be chosen by successor counsel. That's the duty in Georgetown, right? And in conflict with that is the imperative to repeat the performance, to do exactly what was done before in Horry County, and that's what was done. I'm sorry, why is that the imperative? The duty to Mr. Stanko in the previous case. I understand that part. I don't understand why you think there would be an imperative for counsel to do exactly the same thing. Yeah, because deficient performance and ineffectiveness is being litigated in Georgetown. Why can't he just say if he wants to do something different? Of course I did something different because it didn't work the first time. I mean, a big piece of your briefing is that any reasonable counsel would have changed approaches, and so it's hard for me to see why that would put him in some kind of a bind. If he wants to do something different, he'll just say I changed it because we lost the first time. Then that would be evidence of his deficient performance. No, it wouldn't. It would be learning from your mistakes or learning from something that didn't work. That's not evidence of deficiency. That's evidence of adaptability. It could be construed that way, but I think more readily it's understood to be, well, this was done the right way. That jury didn't get it. We're going to try it again because if I divert from that process, I will show that, well, putting on a psychopathy defense, which is totally beyond any sort of sense of reasonable strategy by any measure, you know, it would bring to light those very grave questions as to the judgment and the execution of that defense at that time. You don't say what the ineffective assistance claim actually is, and from what I can glean from what record we do have on that, I think both Mr. Stanko and one of the lawyers said, no, no, we don't have a problem here because the ineffective assistance thing is just about some, like, failures to object and sort of trial strategies, if you will. But it didn't seem, from what we have in the record, that the ineffective assistance claim was going to be you put on the wrong defense. And you don't tell us otherwise. So you're asking us sort of to just assume, well, the ineffective assistance claim will be you put on the wrong defense, and therefore he will have to stick with the same defense. But we don't even know what the ineffective assistance claim is. It's the determination of a patently unreasonable strategy, and it's the carrying out, the particulars that I was referring to with respect to the mental health evidence. That is what the ineffective assistance claim is. Why don't we have that in the record or in your brief? Like, this is the first time I am hearing what the ineffective assistance claim is. Your Honor, yes. So the conflict sort of swallowed the issue, to be direct about it. However, competent representation here certainly would not have contemplated, let alone marshaled, a case that hinged on putting forward that the defendant is a psychopath, comparing him to Ted Bundy and or Jeffrey Dahmer. That's not evidence that Capitol Council would competently put forward. I'm sorry. Just so I understand, because I don't have the state record at the top of my mind, did somebody actually say he was like Jeffrey Dahmer? Yes, Your Honor. Okay. That seems good. Right. The expert. And counsel and the expert repeatedly referred to him as a psychopath, which, you know, as reflected in the standard of care articulated back in the 90s and 2000, and there's clear literature on this, those are the things that defense counsel needs to be prepared to combat from the state, right? And, in fact, this court has found, as of 2000, that it's reversible error to not permit sur rebuttal of the introduction of the term psychopath with respect to a defendant on a cross-examination of a government witness, right? It's brecht error, it's harmful error to not permit sur rebuttal of evidence of psychopathy put forward by the government or the state. That's how injurious labeling a defendant psychopath can be. And here we have the defense hinging its whole case on that. When you say hinging their whole case on that, are you talking about the guilt phase or the penalty phase? Well, both, because they put forward an affirmative defense of insanity, right? Mr. Diggs put forward seven motions attacking the statute as being unconstitutional and lost. That should have been his water loop. He should have moved on to a competent defense. And, clearly, there's overwhelming evidence of guilt here. So this is not a whodunit case, but there is a way to put forward that evidence, even in the liability phase, to front load it within the standard of care and then go into the penalty phase and to marshal the evidence as to mental illness and brain damage to make a case for punishment less than death. And that just simply was not done. The worst possible, most aggravating possible case was put forward instead in a case that doesn't have parallels and then was repeated. And so when I go back to, well... Mr. Perdovich, you're well over time, so I need you to wrap up. All right. So, obviously, in rebuttal, I'd like to be able to address further the prejudice with respect to the deficient performance as a matter of strategy and tactics here for Mr. Diggs. Thank you. Thank you. Mr. Maberg. May it please the Court. I first want to start with something Judge Heighton picked up on. The appellate grounds three and four, they were procedurally defaulted at the PCR court level. They were not raised on appeal to our Supreme Court. But not only that, when we filed our motion for summary judgment in the district court, they did not respond to my assertion that those grounds were barred. They did not raise any kind of argument that those grounds were not barred until under Coleman, V. Thompson, Murray, and Carrier, until they filed their Rule 59 motion. And that's one reason Judge Gergel denied those claims. The first time they were raised was in a motion to alter amend, and that was... Are you saying that they weren't preserved because they didn't strictly follow the rules of procedure that Judge Harris mentioned earlier by asserting them as assignments? Because I think if you read the petition to the Supreme Court in its entirety, the petition does lay out the operative facts and the claims, albeit perhaps not in a logical and comprehensive way. So which one is it? Not at all or not in the manner provided by the rules? There's two. Under Coleman and Murray and Smith, you have to raise the issue to the appellate court. They did not raise that issue. And our law in South Carolina, to preserve it, it's got to be in the statement of issue on appeal or actually discussed in the brief, not in a footnote. Their argument on appeal, if you read their petition for cert to the South Carolina Supreme Court from the denial of PCR, their argument is trial court error in denying our funding. And they asked for a remand and a new trial on the entire PCR. So they didn't raise grounds three and four. But that doesn't matter. They conceded in the district court that these grounds were procedurally barred. Well, they conceded one, I think, not issue three, maybe not four. They actually conceded both. Yes, sir. They didn't respond. When I filed my motion for summary judgment, I asserted three and four, which was actually several grounds, but if you put them together, I said these are procedurally barred under Coleman, Murray, and Smith, and they didn't respond at all. They waited until the judge found them barred in the Rule 59 motion. Okay. So there's two potential levels of forfeiture here, right? One level of forfeiture is forfeited in front of the state Supreme Court. Correct. And then the other possible level of forfeiture is forfeited before the district court and or us. Correct. So I want to focus on the first one, forfeiture before the state Supreme Court. Yes, sir. How do you respond to the argument that Gordon v. Braxton just seems to say you're wrong about that? Gordon, like, sort of dealt with a kind of similar fact situation where something was presented sort of obliquely. Like, you're familiar with our decision in Gordon v. Braxton? If you restate it real quick. Well, it just strikes me as the decision that basically says it's not about whether it's in the headings and it's not about whether it's a separate argument. It's whether the substance of the claim was fairly presented in an opinion of this court, a published opinion of this court, says that is enough for purposes of exhaustion. And this case looks pretty similar to me to that one. They vetted claims three and four to the district court, and the district court denied them. They were not. They're claiming that. Again, I'm not talking about any forfeiture that might have happened before Judge Gergel. Right. I'm talking about the first order of forfeiture question, whether these were in fact exhausted in state court. And I know Judge Gergel said they weren't, but I guess what I'm just saying is under Gordon, I think it's possible Judge Gergel was wrong when he said that. I don't agree. But what's the argument? I mean, I realize it's hard to ask you about a case that you apparently haven't read, but if I posit for you that we have a case that seems to say you don't have to put something in the statement of issues, as long as it's sort of there. I mean, why aren't, assuming that the standard is more lenient than the standard that I think you want to argue for, why aren't footnotes 10 to 12 of their state Supreme Court PCR brief enough? Because they do not discuss the merits of those claims below. They are just talking about these are the claims we wanted to develop below, but they don't go into the merits. The PCR court addressed both the merits of the ground three and ground four, and all they had to do was raise those two claims to the South Carolina Supreme Court. I mean, very easily, and under Davila v. Davis, they can't claim ineffective assistance of PCR appellate counsel to get around the procedural bar. This is not a Martinez issue. This is a PCR appellate counsel just chose not to raise those claims for strategic reasons, I believe. They wanted to put the Supreme Court in a box and say send it back because of the funding issue. But that's all they asked for. They didn't ask for relief on constitutional grounds. They asked for a new PCR hearing with the funding below. But on that point, I'd like to point out to the court, I went back and read the funding request in the PCR court. They asked for an expert to dispute Dr. Spicer's analysis of the PET scan, and they asked for an expert, Dr. Susan Knight, to relate the defendant's mental illness to his entire life and maybe find some other mental illness that the earlier experts did not find. This court has said over and over, you can always find another expert who will give you a different opinion. The question is, did counsel hire appropriate experts? Did he provide them with the appropriate information? And then he can rely on his experts' opinions. And that's what he did in this case. He relied on his experts' opinions, and at least he came up with some kind of mental health defense that this defendant had involuntarily acquired antisocial personality disorder. It was based on a brain defect, and it wasn't something he chose to be over his lifetime. The funding that they asked for in federal court from Judge Gergel has to do, at least my understanding of what was unsealed, has to do with whether the defendant was competent to waive a conflict. So it does not fit under E-2. It doesn't go to his actual innocence. He's not raising a claim that I had some other mental illness that I'm aware of that makes me not guilty. As they conceded just a minute ago in their argument, this was not a whodunit case. This was a case, basically, Mr. Stanko and his trial counsel were trapped. He was going to be convicted of Mr. Turner's murder, and evidence was going to come in of another, even more horrendous murder, and he had just got out of prison for another kidnapping and cons and schemes, and he started doing those immediately. So they had to come up with some kind of mitigating defense. And how is, well, maybe you disagree with this characterization, but how is painting him as a psychopath because of a brain disorder helpful to that story? Their defense in Horry County, they did alter the defense, as Judge Hyten said, from the first trial. In the second trial, they front and center pushed brain defect, and they had birth records from his mother at Guantanamo Bay and Mr. Stanko's birth records, and they had to call the family, and they were not even sure he was going to make it. And so they had arguable intracranial brain damage at birth, and then they had a head injury when he was a teenager, and as a result of that head injury, his affect changed. They had pictures showing his affect changed over time. So they had an argument. The argument was his whole life history, exactly what they asked for an expert for in state court PCR, their argument was his whole life history of criminal behavior was because of this brain defect. It was not something he chose. It was involuntarily acquired antisocial personality disorder. If they had left this out, if they had not presented this evidence, we would be here today on a completely different claim, that they didn't present what they had in this case. As to issues one and two, those were addressed on the merits in the state court. The conflict was addressed by the Supreme Court, but I want to note, first they found it wasn't preserved under an adequate and independent state law basis. We require an objection at the circuit court level, and we require that it be made by the defendant. By definition, the defendant is not going to make an objection if he's insisting on retaining his original counsel. So it seems almost circular and almost impossible to preserve that kind of a claim. Well, if you insist on retaining a counsel that you're told multiple times there's either a potential conflict or an actual conflict, then that's correct. Except if the conflict isn't waivable. There's no Supreme Court authority that says that this conflict is not waivable. Well, that's a different argument, but assuming it was, and I know you disagree, but if it was, then by definition, right, the defendant can't preserve the issue if he's insisting on retaining his counsel. If there was some U.S. Supreme Court authority that said you could not waive this conflict, but there is none, and that's what we're here under AEDPA. Well, can I ask you why we're considering that question under AEDPA? Because it does seem to me that the state courts didn't address it. They addressed whether the waiver was valid, but that the only argument made to the state PCR court and then in the cert petition was there is one reference to it can't be waived, but it was it can't be waived based on this unintelligent waiver. So I don't actually see the state courts addressing whether this is waivable or not in the PCR proceedings. They addressed, the only claim that they addressed in PCR was ineffective assistance of counsel for failure to advise on the conflict. Right. And they took that, they actually took that. I agree, but the state court never had an occasion to address whether this is a per se unwaivable conflict, and because it was not addressed, I don't see why we can't review it de novo, but you can set me straight. You could review it. Actually, the Supreme Court did address it by implication. After they found it wasn't preserved, they said there was a waiver, it was a valid waiver, and they cited break. That is a different question from whether or not it is waivable. There's two questions. Can it be waived, and if so, was there a valid waiver? The state Supreme Court and then the state PCR court focused exclusively on the second question. Was there a valid waiver? I don't see anything. You can tell me if I'm wrong, but where in the record do I see a state court saying this is not a per se nonwaivable conflict? I don't see it. They didn't use that specific language, Judge Harris. How close did they come? But by addressing the waiver issue and finding that there was a waiver, by implication they found that that was a waivable conflict. Do you think somebody argued to them that it was a nonwaivable conflict? Yes. Because I also didn't see that. Okay. I think they did. Where was that argued? I just think they argued it generally in their brief. That's what I remember. I handled the direct appeal. Not the direct appeal, but was it argued in the PCR proceedings? I prepared for the PCR, and I had a death in the family, and somebody else actually tried the PCR case. I don't remember whether they argued it was nonwaivable. I'm pretty sure they did. I mean, that's something that they raised over and over again. But there's no U.S. Supreme Court precedent that says this is a nonwaivable. And under Marshall v. . . But, again, that's a merit. That's an argument that you're just right on the merits, that it's not, in fact, unwaivable. It's not an argument that the state court addressed that question. They did not address the question whether, the specific question, whether you could waive this conflict explicitly. They didn't say that. But by finding that it was waived, they implicitly found you can waive this conflict. I thought it was unwaivable. There would be no occasion to discuss the validity of the waiver? That's correct. And on these two claims, Claim 1 and Claim 2, they were both addressed on the merits by the state court. And so penholster applies, and they cannot go outside the state court record. They can't present this new information. And Judge Gergel knew this in granting summary judgment below. He looked at the claims. He looked at what was going on with the funding, and he determined, I can grant summary judgment because this, under Shin and Twyford, this new evidence in federal habeas is not admissible, as this court said earlier. It doesn't make any difference. If you remanded it back to the district court, Judge Gergel is going to look at it again. It's going to be the exact same thing. This new funded experts, as in Twyford, a brain scan or a brain expert's opinion is not going to be admissible under penholster on the merits of the claim. As to Ground 3 and 4, under Shin, it's not going to be admissible on the merits of the claim. Can I ask you what your position is on whether we need a certificate of appealability to examine that question? On which one? Whether the district court properly granted summary judgment and then denied the 59E without waiting for the results of the testing. I believe that. As I understand it, you just explained why that was right on the merits, because it's not relevant, not admissible. But what about whether we need a certificate of appealability to address that? I believe we do because, in this case, because they only raised this issue about being denied due process by Judge Gergel ruling before they finished in Appeal 22.2. That appeal had only to do with the unsealing of funding, ex parte funding below. They raised that in their Rule 59 motion, and I asked to unseal solely for that reason. I didn't care anything about what was going on with the brain scan. All I knew is that he had been transported because we had to transport him. But when they raised that in their Rule 59 motion, I asked the court to unseal it so I could respond to their 59 motion. Well, now in 22.2, that's where they're raising this due process claim that Judge Gergel violated their due process rights by not letting them finish their investigation and present that evidence. So they haven't properly raised it, and they should have raised it to this court and got a certificate of appealability from this court in Appeal 22.3, not 22.2. But regardless, Judge Gergel could not violate Mr. Stanko's due process rights because, as this court has said over and over again, in a summary judgment motion you have to present evidence that is admissible to overcome a summary judgment motion. I believe that's Maryland Commissioner v. Maryland. You have to present admissible evidence to overcome a summary judgment motion. All they have presented is evidence that's not admissible. I have a couple of questions about 22.2. Do you agree that regardless of whether we had jurisdiction over 22.2 when it was filed, whether we are appellate jurisdiction is what I'm specifically talking about, do you agree that we now have it under the doctrine of cumulative finality? Yes, but it's moot. No, I just, so, right. But you have, yes. My next question is about mootness. And so your opinion is that it's moot. Okay, so you're going to ask that. I'm sorry. No, go ahead. I guess I'm just going to ask you, why doesn't the Supreme Court's decision in Scientology suggest that it's not moot? Why does, excuse me? Are you familiar with the Supreme Court's decision? I believe it's Internal Revenue Service versus Scientology. Are you familiar with that case? No, sir. Let me give you the facts of that case. Okay. The facts of that case are the Internal Revenue Service seizes some documents from the Church of Scientology. The Church of Scientology is of the view that the government should not have seized those documents. And they asked for them back and to destroy the documents that were seized from the Church of Scientology. And the argument basically is cats out of the bag. The government has the documents. You can't, like, unsee the documents you've already seen. And the Supreme Court holds that case is not moot. And they say it's not moot because you could order the government to destroy the copies of the documents that it has. And they also leave open the question about whether you could forbid the government from using them in future proceedings. They don't decide. But they say that case is not moot because even though that's true, cats out of the bag, the government's already taken the documents, the government's already gotten the documents, the case isn't Article III moot because you could order the government to destroy the copies of the documents in its possession and although that would not fully address the Church's concerns, it would at least ameliorate some of the concerns. Why is that case different from this one? Okay, I'm sorry I wasn't aware of that. But this case is completely different because we didn't just go to seize documents from this defense. I know, but Judge Gergel could at least in theory say, to the extent you've seen these documents, A, they're resealed so you can't get them anymore. B, to the extent that you've downloaded any copies, destroy them or return them to the court. That doesn't give Mr. Stanko everything he wants, but it gets him something. Why isn't that enough? I think it's moot because they raised it. They made it relevant. That's an argument that it fails. That's an argument that the unsealing order is okay. That's not an argument that the challenge isn't moot. Well, I think, respectfully, I think if he raises it in a Rule 59 motion and he makes the documents relevant that were sealed and these were sealed kind of unquestionable circumstances. There was no record. There was no transcript. But when he raises it and makes it relevant, and that's the reason the judge unseals the documents, I think the issue is moot. Of course, if this court wants to order us to destroy whatever has been unsealed, that's within its authority, I believe. But I think my argument is the issue is moot. I have nothing further. I will yield the rest of my time. Thank you. Yes, sir. Mr. Perkovich. Thank you, Your Honor. Quickly, the case on psychopathy and Brecht harmful error is Barnett from 2000 from this court. Also, I just want to point to a Fifth Circuit authority in terms of 2254B1B2 with regard to the deprivation or defect of state process. That's sort of a 2017 decision. If you want to talk about the merits of the psychopathy defense, so the state court, the state PCR court, you know, considered that issue at some length, and it went through just like, you know, a pretty point-by-point description of all of the medical testimony, and it came to the conclusion that the psychopath label, first of all, was not used during the mitigation phase, only at the trial, the guilt phase, and that when you looked at it in context with all of this evidence about the brain defect and the sort of unintentional nature of the actions, that the label itself, like that was not the gist of the defense at all. It was a label that was used a couple of times as a synonym for antisocial personality disorder, and that the gist of the defense was that he just wasn't responsible for his actions and that that is a perfectly valid defense. And so on this one, I think everyone agrees we would have to be able to say that that is an unreasonable reading of the state court record under AEDPA. Yeah, in the sense that the state court, of course, is construing whether that's reasonable strategy and tactics, and has radically unreasonable strategy and tactics as a matter of the standard of care, well established. But I guess if I could just ask, I feel like there are almost sort of two questions here. One is how do you kind of describe what the strategy was? And the state court is saying this was not a psychopath strategy. This was a very medically detailed and sophisticated strategy about an inherent brain defect exacerbated by the injury when he gets hit in the head. And the gist of it is he's just not responsible for his actions. So one question is, like, is it a psychopath strategy or is it the strategy that the state court is describing? And then there's another question about once you know what the strategy is, was it reasonable? And so where is it that you are saying the state court made an unreasonable determination under AEDPA? Well, that it wasn't a psychopathy-driven strategy. Okay, so it's the description of the strategy that you think is unreasonable. That is unreasonable, and the strategy, and even that characterization that the court made is an unreasonable articulation of sort of the best-dressed-up version of what transpired in that record. Because what was put forward was an unmitigated parade of evidence that this is a person who couldn't help but kill, was remorseless. These are exactly the things that defense counsel need to combat when the state puts that evidence in, not marshal a case affirmatively in that way. This was so much of an outlier. You could scan the landscape and struggle to find a case that is remotely analogous to this sort of evidence. There were, again, fancy imaging and sort of very hyper-technical discussion by certain experts all to allow the psychiatrist to testify he's a psychopath and you can't blame him. That's a case that would not pass muster with respect to the liability, the insanity defense. It was laughable as a matter of fact in law at that time, and is extremely damaging. It could not be more damaging. The jury views this evidence, and they want to euthanize the defendant. They're afraid of the defendant, and almost rightly so in the sense of how that evidence was put forward. There was never a mental health evaluation to begin to inductively develop a case that might learn. Our counsel articulated well with respect to the birth defects, trouble with his birth, brain damage incidents. There are serious major red flags. They were not developed, and there's a competent standard of care that develops those things. I mean, there was testimony about both the birth defect and then the episode where he gets hit. I mean, that was all brought out. The pieces of it were put together to put together a foundation for the psychiatrist to say he's a psychopath. You cannot blame him, and no jury is going to hold somebody like that blameless. That's just, and this is... Wasn't there all that testimony about didn't they bring in people? I mean, I hear what you're saying, but I guess just as a total lay reader, it seemed reasonably sympathetic to me that they brought in all these people to testify until he got hit in the head. He had a perfectly pleasing personality, lovely guy. It was all because of this brain problem that he did this. And then didn't they bring in correctional officers also to say he's a model prisoner now? So I don't think it's... Just again with the strategy, I think what it's telling is after the first trial, the program 48 hours had an on-camera interview with defense counsel, Mr. Diggs. Jurors from that trial also had on-camera interviews, and they could not have been clearer about how alienating to them that kind of case was. And that's something that is beyond well-known. It's a rule of thumb for any capital defense attorney. And again, this is such an outlier. You can scour the annals of all the reporters, and you're not going to find many cases other than what Dr. Satche testified in Georgia. Mr. Perkovich, I'm sorry. So are you saying that as a matter of law, it's an effective assistance of counsel for a lawyer to develop a strategy that says, you know, for the better part of a defendant's life, he was a perfectly normal human being until, as Judge Harris indicated, he suffered a traumatic injury which caused a brain disorder, and that brain disorder was the cause of his then apparent violent behavior? You're saying that that's ineffective assistance of counsel to present that evidence? No, Your Honor. The fine point on that is on that evidence, it's the articulation from the expert that the so what from all that is, this man is rendered a psychopath, right, which is not a clinical term in the DSM-5. It is not a diagnostic clinical analysis. It's a label that is very, at best, contested. So it's not a reasonable medical theory as to explaining that evidence. So just so I understand the kind of the nub of the argument here, the state court said when the term psychopath was used, it was clearly as a synonym for antisocial personality disorder. So your objection, or at least the objection before the PCR court, as I understand it, was really about the label psychopath, not about the general brain disorder strategy, but you just can't use the term psychopath when what you really mean is antisocial personality disorder? And either way, with respect to those labels, what is known in the standard of care, and I can point to an article from two leading South Carolina practitioners in Champion in 2000, Voisin and Bloom, and the Advocate in 1995, pointing out that antisocial personality disorder is a death sentence. Okay, so that one's bad, too. It's not just the label psychopath. Then isn't it sort of weird, I feel like then either this wasn't argued before the state court or the state court badly misunderstood the argument when it said the few times when the term psychopath was used, it was clear what was really meant was antisocial personality disorder. Did the state court just completely misunderstand the argument in front of it? Well, simply yes. Okay.  This doesn't rectify the antisocial personality disorder. It is about using the diagnosis of antisocial personality disorder. That, too, was ineffective. Yes, Your Honor. Okay. That's inherently not mitigating. Okay. And that's in the papers. And that's empirically established. Mr. Perkovich, you said that in South Carolina that's apparently very clear now that that kind of defense is not effective. But where in the case law does it say that? So in the case law, it's the absence of cases dealing with this phenomenon. So one case I can point to is the Georgia case called Rivera where Dr. Sachi testified to this effect and led to a death sentence immediately prior to the two trials here. And I think people realize, okay, psychopathy is not going to be a viable insanity defense, nor is it deemed mitigating. With respect to the standard of care, that's a function of not just jurisprudence, but as our jurisprudence in this court recognizes ABA guidelines and other sources with respect to the standard of care. So it's less a matter of articulation in the authorities that psychopathy is patently not a reasonable strategy. It's a function of what is known in the capital defense community, and that is beyond well established and has been for many decades, that that is the last thing on earth literally that defense counsel should put forth. Much of the indicia of this that has been pointed to is a starting point for the type of mitigation case, a case for life, that a competent lawyer would marshal. I'm not disputing that. It's incomplete. And, again, there's never been a meaningful mental health evaluation in this case to understand what a complete determination of this would look like and a competent presentation of it in a state court context would have been. That's what's been frustrated throughout this whole process. The experts have not been competently engaged. They've only been siloed in fragmented ways to prop up a charlatan, to be blunt, to put forward this psychopathy theory that was novel then and is anomalous to this day. All right. Thank you, Mr. Perkovich. Thank you. I note that you and your firm are court appointed. I want to thank you and also Mr. Gross for taking on this very important appeal of this case. Mr. Stanko was ably represented here today. And also, Mr. Mabry, I want to thank you on behalf of the state. We'll come down and recounsel and move on to our next case.
judges: Albert Diaz, Pamela A. Harris, Toby J. Heytens